PER CURIAM.
This cause is before the court upon an appeal from the Career Service Commission which upheld orders of the Department of Health and Rehabilitative Services suspending or terminating the appellants from their positions as security guards at South Florida State Hospital. Another aspect of this same dispute was before this court in State Dept. of Health and Rehab. Services v. Artis, 345 So.2d 1109 (Fla. 4th DCA 1977) and the underlying facts thereof are set out in that opinion.
At issue is whether the Commission’s decision is supported by competent substantial evidence. Andrus v. Florida Dept. of Labor and Employment Security, Division of Employment Security, 379 So.2d 468 (Fla. 4th DCA 1980).
The findings of fact of the Commission are set out as follows:
1. Even though some irregularities occurred in the preparation and mailing of notices of suspension and dismissal because of the crisis situation, the Appellants were properly notified of their suspensions and dismissals and their right to appeal to the Career Service Commission. They timely filed their appeals with this Commission, the appeals were accepted for hearing, and this Commission has jurisdiction of the cause.
2. The issue to be determined by this Commission is whether the Agency had good and just cause to effect the suspensions and dismissals of the Appellants named herein.
3. Prior to September 19,1976, Mr. Robert Kelly, District Administrator for District X of the Agency, had been meeting with a representative group of employees attempting to obtain additional salary increments for security officers at the hospital, representing hazardous duty pay, and he had been attempting to obtain an answer to this request from the Department’s headquarters in Tallahassee. At a meeting prior to September 18, 1976, at which time another meeting was scheduled, the group of representatives meeting with Mr. Kelly consisted of Appellants Galizia, Perrothers, and Montgomery.
4. Evidence presented revealed that a personnel action in the form of a sick-out had been originally planned by the security officers on the day shift for Monday, September 20, 1976; however, upon the group learning that the administration had been advised of such action, the sickout was moved forward to Sunday, September 19, 1976.
5. On September 18, 1976, during the evening hours, and the morning hours of September 19, 1976, some 23 of the 26 security officers due to report at 7:00 a. m. on Sunday, September 19, 1976, called into the Agency reporting they were sick.
6. Prior to or at the expiration of the night shift’s schedule, an attempt was made by the Agency to notify the members of that shift to remain on duty, to wait for a meeting with the Chief of Security and Mr. Robert Kelly, District Administrator. In spite of this request and the obvious nonappearance of the day shift relief, night shift employees, except in certain instances, left their posts of duty. They signed out and left the hospital grounds without proper relief, thereby deserting their duty posts.
7. On September 19, 1976, around noon, Administrator Kelly’s staff attempted to reach, and did reach, most of the day shift employees, advising them to report for duty in uniform in one hour or face suspension. Certain representatives or spokesmen on behalf of the security officers requested permission to hold a meeting at the hospital at 2:00 p. m. that date with all the security staff.
8. The testimony and evidence was contradictory regarding notification to all of these security officers. It was alleged that some of the members of the night shift were not accurately or correctly advised not to leave their posts on the morning of Sunday, September 19, 1976. However, this Commission finds it difficult to imagine someone trained as a security officer, and working with mentally disturbed residents and court-hold pa *1172 tients, leaving his duty post without proper relief, as did these officers.
9. During the late morning of September 19, 1976, most of the security officers were contacted either by the administrative staff or the three spokesmen mentioned above and they were advised to report in uniform to the hospital grounds that afternoon ready for duty..
10. Those employees reporting for duty allegedly were directed by security on the hospital grounds to a meeting being held at the Administration Building of the hospital. At that meeting Mr. Kelly met with the men and read the group assembled a memorandum from the Lieutenant Governor concerning the types of action they were taking. At the conclusion of this meeting, Mr. Kelly advised those present that all of the night shift employees leaving their posts were suspended.
11. This Commission does not have jurisdiction under Chapter 447 and will not speak on whether the action of the men constituted a concerted job action. This Commission’s decision will be based on findings of fact in accordance with its jurisdiction under Chapter 110, Florida Statutes, and the Personnel Rules and Regulations relating thereto.
12. The Agency offered each of the affected individuals an opportunity to discuss and review their activities and did indeed try to prevail upon the officers to return to work and not desert their posts of duty.
13. Upon employment, each of the officers admitted receiving a copy of the Agency’s Handbook relating to disciplinary actions and all of the officers admitted they were familiar with standing post orders. There is no doubt that each of these officers involved understood the penalties for leaving his work station and for violating standing post orders.
14. The action of the Appellants resulted in disruption of institutional activities, even though, with the assistance of local law enforcement officers, order was generally maintained throughout the hospital grounds. There was some patient rioting, damages to buildings and equipment, fires set by patients and, of course, serious disruption of patient care.
15. The Commission would remind these Appellants that rather than leave their posts of duties there were other avenues available to them such as filing an internal grievance with their superior officers.
16. This Commission finds that all of the Appellants named herein were well aware of rules governing the Agency and the responsibilities and duties of security officers at an institutional setting. Failure to make sure that proper relief was afforded prior to leaving their duty posts and failing to report to their duty posts without authorized leaves of absence, in and of itself, constitutes patient neglect by the Appellants named herein.
17. From the testimony and evidence presented to this Commission, it finds that the Appellants were guilty of neglecting patients, in that they failed to report or to continue to perform their duties as security guards, thereby endangering the health and welfare of the patients, the other employees and the immediate community as a whole. These employees failed to obey a direct and proper communication to stay at their posts and comply with standing orders.
18. The Commission finds further that all of the Appellants were familiar with post orders and knew the operations procedures upon the change of shifts.
19. From the testimony and evidence presented this Commission finds the Appellants’ actions jeopardized the security of the hospital and created a danger, as stated above, not only to the employees and patients but to the immediate and surrounding community and the Agency’s administrators would have been derelict in their duty had they not taken disciplinary measures against these personnel.
20. In failing to stay on or report to their duty posts, the Appellants were guilty of insubordination as they failed to comply with orders of their supervisors. The Agency offered competent substantial evidence to support the charge of patient neglect, and the action of the Agency should be sustained.
*1173 We have reviewed the lengthy transcripts of testimony and record and conclude therefrom that the1 Commission’s findings are supported by. competent, substantial evidence. Andrus, supra. We have also examined the other points raised by the appellants and find no error.
Accordingly, the decision of the Commission of January 27,1978, is hereby affirmed.
ANSTEAD, MOORE and BERANEK, JJ., concur.